UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| KENNETH HARRISON, LAURA HARRISON and D&L AUTO BODY & TOWING, INC. | : | CIVIL ACTION NO. 3:02CV477 (AVC) |
| | : | |
| **Plaintiffs,** | : | |
| | : | |
| V. | : | |
| | : | |
| SEAN MCMAHON, GERALD R. CHARAMUT, JOHN MIHALICK and JULIE MIHALICK | : | |
| | : | |
| **Defendants.** | : | **APRIL 12, 2004** |

## MEMORANDUM OF LAW
### IN SUPPORT OF PLAINTIFFS' OBJECTION TO DEFENDANTS' SEAN MCMAHON AND GERALD CHARAMUT'S MOTION FOR SUMMARY JUDGMENT

Plaintiffs, KENNETH HARRISON, LAURA HARRISON and D&L AUTOBODY & TOWING, INC. (hereinafter referred to collectively as "Plaintiffs"), hereby object to Defendants', SEAN MCMAHON and GERALD CHARAMUT'S, Motion for Summary Judgment and offer this memorandum of law in support of their objection.

## I.     INTRODUCTION

The present action arises from the issuance of an arrest warrant and subsequent arrest of Plaintiff Kenneth Harrison for a felony charge of issuing a bad check. The action was originally commenced by writ, summons and complaint dated February 19,

2002 in the Superior Court of Connecticut, Judicial District of Hartford. Pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1441, Defendants removed the action to this Court.

The Complaint sets forth the following causes of action: false arrest as to Sean McMahon (First Count); intentional infliction of emotional distress as to Sean McMahon (Second Count); false arrest and intentional infliction of emotional distress as to the Town of Berlin based on the actions of Sean McMahon (Third Count); malicious prosecution as to John Mihalick and Laura Mihalick (Fourth Count); intentional infliction of emotional distress as to John Mihalick and Julie Mihalick (Fifth Count); intentional infliction of emotional distress as to Gerald Charamut (Sixth Count); intentional infliction of emotional distress as to the Town of Berlin based on the actions of Gerald Charamut (Seventh Count); and tortuous interference with a business relationship as to John Mihalick and Julie Mihalick.

In relation to the false arrest claims, Defendants contend that there is no genuine issue of material fact, and that based on the doctrines of qualified and governmental immunity they are entitled to judgment as a matter of law.  Specifically, Defendants contend that Plaintiff Kenneth Harrison was arrested pursuant to a warrant, creating a presumption of probable cause, and that probable cause is a complete defense to a false arrest claim.  In addition, Defendants claim that the charges against Kenneth Harrison were nolled, and therefore he cannot show a favorable disposition sufficient to support a false arrest claim.

Despite Defendants' contentions, a material issue of fact exists as to whether or not probable cause existed for the issuance of the warrant for the arrest of Mr. Harrison. Specifically, Plaintiffs assert that Detective McMahon omitted material exculpatory evidence with the warrant application that restitution for the bounced check had been made, and therefore it was not objectively reasonable for him to believe there was probable cause for the arrest of Mr. Harrison. Moreover, Detective McMahon failed to consider additional intervening exculpatory evidence prior to procuring the arrest of Mr. Harrison. As such, the doctrines of qualified and governmental immunity are inapplicable. Lastly, Plaintiffs can show a favorable disposition of the charges against Mr. Harrison sufficient to support a false arrest claim in that the charges were ultimately dismissed, not merely nolled.

In relation to the intentional infliction of emotional distress claims, Defendants contend that their conduct cannot, as a matter of law, be deemed outrageous, and therefore they are entitled to summary judgment. However, whether Defendants' conduct was extreme and outrageous presents a genuine issue of fact for trial, and therefore Defendants' motion for summary judgment should be denied.

In relation to the claims against the Town of Berlin, Defendants contend that the Town of Berlin was never summoned to appear. Plaintiffs concede that the Town of Berlin is not a defendant to this action as it was never summoned to appear. As such, Plaintiffs do not object to the granting of summary judgment on the Third and Seventh

Counts directed to the Town of Berlin.

## II.   <u>FACTS</u>

At all times relevant hereto, Kenneth Harrison was the owner and operator of D&L Autobody & Towing (hereinafter "D&L"), a tractor-trailer car carrier business.  Deposition of Kenneth Harrison of 8/8/03 ("K. Harrison Dep.") at 57-61, attached as Exhibit A.   In January of 1999, Mr. Harrison employed co-defendant John Mihalick as an independent contractor to haul cars for D&L.  K. Harrison Dep. at 92.  The agreement between the two was that Mihalik would be paid on a monthly basis when Harrison was paid by his principal.  <u>Id</u> at 10.  On January 28, 1999, at Mr. Mihalick's insistance, Mr. Harrison gave Mr. Mihalick a check for $2,640 for car transport services rendered by Mr. Mihalick to D&L. K. Harrison Dep. at 10 & 113.  When he provided the check, Mr. Harrison told Mr. Mihalick to hold the check for a week before depositing it, as he was waiting for a deposit to clear. <u>Ibid</u>.  Instead, on the very same day, Julie Mihalick, the secretary and bookkeeper for Mr. Mihalick's business, presented the check to her bank, Enfield Community Federal Credit Union, for deposit. Deposition of Julie Mihalick of 8/7/03 ("Julie Mihalick Dep.") at 8 & 16, attached as Exhibit B.   The check was processed before Mr. Harrison's funds cleared his account and was returned due to insufficient funds (hereinafter "the Bounced Check").  <u>Id</u>. at 18.

On or about February 9 or 10, 1999 Mr. Mihalick contacted the Berlin Police

Department regarding the Bounced Check.  K. Harrison Dep. at 16.    Personnel from the Berlin Police Department informed the Mihalicks that in order to prosecute Mr. Harrison on a bad check charge they had to give him notice pursuant to Conn.Gen.Statute § 53a-128. Julie Mihalick Dep. at 48.  On the same day, Detective Manning from the Berlin Police Department contacted Mr. Harrison and informed him of Mr. Mihalick's complaint concerning the Bounced Check and advised him of the procedure to resolve the check.  K. Harrison Dep. at 16.  By certified letter ('the Certified Letter"), Mr. Mihalick notified Mr. Harrison of the Bounced Check and informed him that if it was not taken care of within eight days, they would be going through the legal channels to get it resolved.  Id. at 7.  Mr. Harrison received the letter on February 11, 1999.  K. Harrison Dep. at 21.

On or about February 14, 1999, Mr. Harrison gave $2,640.00 in cash to Western Union's local agent, Stop and Shop, to purchase Western Union money orders ("the Money Orders").  K. Harrison Dep. at 8; a copy of the Money Orders is attached as Exhibit C.  Mr. Harrison made full restitution by giving the Money Orders to Mr. Mihalick the same day.  Id. at 11.

Mrs. Mihalick contends that she could not redeem the money orders at Enfield Community Federal Credit Union for cash.  Julie Mihalick Dep. at 53.  Mrs. Mihalick claims the bank refused to cash the Money Orders, saying they were invalid without Mr. Harrison's signature.  Id. at 54.  On February 22, 1999, Mr. Mihalick appeared at the Berlin Police Department, lodged a complaint against Mr. Harrison and signed an affidavit in

support of an Arrest Warrant Application (hereinafter "the Arrest Warrant Application"). Deposition of John Mihalick of 8/7/03 ("John Mihalick Dep.") at 53, attached as Exhibit D; the Arrest Warrant Application is attached as Exhibit E. Mr. Mihalick informed Detective McMahon that he received Western Union Money Orders from Harrison, but that he was unable to cash them. Deposition of Sean McMahon of 8/7/03 ("McMahon Dep.") at 41, attached as Exhibit F.

Detective McMahon accepted the bald assertion of Mr. Mihalick that Mr. Harrison failed to make restitution. Id. at 43-49. Detective McMahon knew this was an unusual case in that Mr. Mihalick had admitted to having received the Money Orders from Mr. Harrison. Id. at 43 & 51. Moreover, Detective McMahon admits he had no knowledge as to how money orders could be utilized in general. Id. at 47: Deposition of Laura Harrison of 8/8/03 ("L. Harrison Dep.") at 39, attached as Exhibit G. Despite these facts, Detective McMahon made no attempt to validate Mr. Mihalick's assertions to determine whether or not the Money Orders were invalid. McMahon Dep. at 43-49. Detective McMahon failed to take the Money Orders into evidence or out of the possession of Mr. Mihalick. Id. at 59-61.

Detective McMahon submitted the Arrest Warrant, his incident report, a copy of the Bounced Check, and the Certified Letter to the Superior Court, G.A. 15. Id. at 37-40; a copy of Detective McMahon's incident report is attached as Exhibit H; a copy of the Bounced Check is attached as Exhibit I; a copy of the Certified Letter is attached as

Exhibit J.   Detective McMahon omitted copies of the Money Orders from the Arrest Warrant Application.  McMahon Dep. at 37-40.  The Arrest Warrant Application states that "no restitution has been made."  Exhibit E.

Sometime after March 19, 1999, Mr. Harrison received a letter from the Berlin Police Department informing him that the arrest warrant issued.  K. Harrison Dep. at 24.  Mr. Harrison contacted Detective McMahon concerning the Arrest Warrant.  Id. at 26.  Detective McMahon conceded to Mr. Harrison that he knew restitution had been made, but told him that Mr. Mihalick said he could not cash the Money Orders because they were not signed by Mr. Harrison.  Id. at 27.  Mr. Harrison indicated he did not want to be arrested, and Detective McMahon stated he would delay serving the warrant while Mr. Harrison attempted to resolve the dispute with the Mihalicks.  Id. at 27-28.  Detective McMahon suggested that Mr. Harrison obtain new money orders.  Id. at 28.

After his conversation with Detective McMahon, Mr. Harrison discussed the issue of the arrest warrant with his wife, Laura Harrison, who was a detective with the Naugatuck Police Department.  Id. at 30.   Detective Harrison was concerned that despite Detective McMahon's promise to delay serving the arrest warrant, the warrant may still get entered into the system and that Mr. Harrison could well get picked up on the warrant.  L. Harrison Dep. at 24-28.   On March 25, 2003, Detective Harrison visited the Berlin Police Department and discussed the arrest warrant with Detective McMahon.  Id. at 25-26.

In discussing how to resolve the arrest warrant, Detective Harrison stated that

"maybe I can get it vacated, if we make good" on the Bounced Check.  Id. at 38.  Detective McMahon "snapped at [her] saying if anybody was going to vacate, it would be him," and that "it was his investigation."  Ibid.  Detective Harrison did not mean to imply that she herself would vacate the warrant, nor was she trying to use her authority as a police officer.  Id. at 33-38.  At that meeting, on March 25, 1999, Detective McMahon also told Detective Harrison of a previous theft investigation a month prior to this incident at Mr. Harrison's business, and called into question Mr. Harrison's character.  Id. at 30-31.  Specifically, Detective McMahon implied that the theft must have been an inside job.  Ibid.  At the conclusion of the meeting, Detective Harrison understood that the warrant would be resolved if Mr. Harrison gave the Mihalicks new money orders.  Id. at 41.  Detective McMahon told Detective Harrison that if Mr. Harrison showed that he made restitution with new money orders, he would have the warrant vacated.  McMahon Dep. at 70.

The next day, Detective Harrison contacted Western Union to ascertain how to void the Money Orders.  L. Harrison Dep. at 41. Detective Harrison also inquired as to whether the Money Orders that the Mihalicks had in their possession were valid without the signature of the purchaser.  Ibid.  Western Union informed Detective Harrison that the Money Orders were valid financial instruments whether they were signed by the purchaser or not.  Id. at 43.  Western Union informed Detective Harrison that it would take five to seven business days to cancel the Money Orders.  L. Harrison Dep. at 43.  Detective Harrison was concerned that if they sent the Mihalicks new money orders, they would

have two sets of valid money orders and they could cash both sets before the cancellation of the original Money Orders.  Ibid.  Detective Harrison was also concerned that if Mr. Harrison waited five to seven days for the original Money Orders to be cancelled and then provided new ones, he may get picked up on the Arrest Warrant in the interim before it was vacated.  Id. at  43-44.   Therefore, at Detective Harrison's request, Western Union provided Detective Harrison with a letter verifying that the Money Orders in the Mihalick's possession were valid without the purchaser's, Harrison's, signature.  Id. at 45-46; a copy of the letter from First Data Corp. dated March 29, 1999 is attached as Exhibit K.

On March 30, 1999, Mr. Harrison contacted the chief of police, co-defendant Gerald Charamut, of the Berlin Police Department.  K. Harrison Dep. at 39.  Mr. Harrison informed Chief Charamut that he had proof that the Money Orders the Mihalicks had, without his signature, were valid.  Id. at 40.  In response, the chief stated "if the prosecutor signed the warrant, you must be guilty. Turn yourself in."  Ibid.  Mr. Harrison informed Detective Harrison of this conversation and she proposed that they visit the Berlin Police Department and speak to Detective McMahon.  Id. at 41.

On the afternoon of March 30, 1999, Mr. Harrison and Detective Harrison went to the Berlin Police Department together with the intent of showing Detective McMahon the letter from Western Union.  Id. at 41-42.  Detective Harrison informed Detective McMahon that she had a letter from Western Union confirming that the Money Orders were valid without a signature.  L. Harrison Dep. at 52.  Instead of listening to Detective Harrison,

Detective McMahon asked whether the Harrisons had provided the Mihalicks with new money orders.  Ibid.  Detective Harrison informed him they did not, because the Money Orders in the Mihaliks' possession were valid.  Ibid.  Detective Harrison held out the letter from Western Union for Detective McMahon.  Ibid.  At that point, Detective McMahon became loud and belligerent, stating "I'll tell you what we're going to do, detective. Your husband's under arrest."  Id. at 53; K. Harrison Dep. at 45-46.  Detective McMahon then held a door open leading into the interior of the police department, stated "your husband's going in the back," pointed a finger at Mr. Harrison, and motioned for him to go in the back. L. Harrison Dep. at 53.  Detective McMahon stated "he's under arrest," and "call in another officer to process him, because I'm going home."  Ibid.  Detective Harrison again informed Detective McMahon that she had a letter stating the Money Orders were valid and again attempted to hand it to him.  Id. 53-54.  Detective McMahon said "I'm not looking at nothing," and accompanied Mr. Harrison into the interior of the police department.  Id. at 54.  After Mr. Harrison was arrested and escorted into the police department for processing, Detective Harrison and Detective McMahon exchanged words in a small lobby in the front of the police station.  Id. At 57.

In June, 1999, after directed to do so by the State's Attorney's Office, the Mihalick's deposited the same Money Orders that Mr. Harrison gave them on or about February 14, 1999 at their bank.  John Mihalick Dep. at 76; Julie Mihalick Dep. at 54 & 64.  Mr. Harrison never signed the Money Orders prior to the Mihalick's depositing them.  Affidavit of Ken

Harrison of _____, attached as Exhibit L.  In its letter dated June 15, 1999, the State's Attorney's Office stated that the Money Orders were valid when they were given to the Mihalick's by Mr. Harrison on February 14, 1999.  See a copy of the letter from Anthony Duarte to Mr. Mihalick dated June 15, 1998 (sic) attached as Exhibit M.

After Mr. Harrison's arrest, Defendant Chief Charamut sent a letter to Chief Dennis Clisham of the Naugatuck Police Department dated April 6, 1999, including a copy of a letter sent by Detective McMahon to Chief Charamut dated April 2, 1999. Deposition of Gerald Charamut of 8/8/03 ("Charamut Dep.") at 23, attached as Exhibit N; a copy of the letter from Chief Charamut to Chief Clisham dated April 6, 1999 is attached as Exhibit O. The letter, including the attached letter from Detective McMahon, contains the following false accusations regarding Detective Harrison's actions: that she "repeatedly stated that she knew of the prosecutors at GA 15 and that she was contemplating contacting said prosecutor and having the arrest warrant vacated;" that Detective Harrison indicated she would use her authority a member of the Naugatuck Police Department to interfere with Detective McMahon's investigation and that she would use her authority to have the warrant vacated; that Detective Harrison "made several derogatory comments about Mr. Mihalick;" that Detective Harrison was "extremely belligerent and hostile" toward Detective McMahon; that this act would "come back to [Detective McMahon];" that "knowing that [Detective McMahon's] shift was concluding, [Detective Harrison] yelled at him to, 'Go on. Get out;'" that Detective Harrison stated to Detective McMahon that "she would speak to

[him] and behave in any manner that she pleased;" and that Detective Harrison "kept shoving her hand outward and pointing at [Detective McMahon] while coming within sever inches of [his] face." Ibid. Detective Harrison categorically denies all of these accusations. L. Harrison Dep. at 36-39; Affidavit of Laura Harrison of 4/12/04, attached as Exhibit P.

The charges against Mr. Harrison resulted in the entry of a dismissal. State v. Harrison.  Transcript of State v. Harrison, CR 990182036-S, July 8, 1999 attached as Exhibit Q.

## III.    ARGUMENT

### A.    SUMMARY JUDGMENT STANDARD

Summary judgment should only be granted when the evidentiary record shows that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); Astrada v. Howard, 979 F.Supp. 90, 93 (D. Conn. 1997).  The moving party bears the burden of showing that no genuine issue of material facts exists.  Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).  In determining whether the record presents genuine issues for trial, the court must view all inferences and ambiguities in the light most favorable to the non-moving party.  Bryant v. Maffucci 923 F.2d 979, 982 (2.d Cir. 1991).  Even if the court believes that the non-moving party is unlikely to prevail at trial, summary judgment is not warranted if an issue of fact remains.  Jobson v. Henne, 355 F.2d 129,133 (2.d Cir. 1966).

**B.    DEFENDANT'S FALSE ARREST OF KENNETH HARRISON CONSTITUTED A VIOLATION OF 42 U.S.C. § 1983**

Section 1983 of Title 42 of the United States Code "provides an instrument by which an individual deprived of a federal right by a person acting under color of state law may be compensated.  Robinson v. Town of Colonie, 387 F.Supp. 387, 394 (N.D.N.Y. 1995).   In order to establish a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or law of the United States.  Rendell-Baker v. Kohn, 457 U.S. 830, 835, 102 S.Ct. 2764, 2768, 73 L.Ed.2d 418 (1982).  False arrest is the unlawful arrest by one person of the physical liberty of another.  Green v. Donroe, 186 Conn. 265, 267, 440 A.2d 973, 974 (1982). "A false arrest by a state actor implicates a person's Fourth Amendment rights and may raise a cognizable claim under § 1983."  Shattuck v. Town of Stratford, 233 F.Supp.2d 301, 306 (D.Conn 2002) (quoting Cook v. Sheldon, 41 F.3d 73, 77 (2d Cr. 1994)).

Mr. Harrison's false arrest claim involves his "long established constitutional right to be free from arrest . . . in the absence of probable cause."  Smith v. Edwards, 175 F.3d 99, 105 (2d Cir. 1999) (citations omitted) (internal quotation marks omitted).  In relation to an arrest made pursuant to a warrant, "this right can be particularized as the right to be free

from an arrest based on a warrant that would not have been issued if the officer seeking the warrant had disclosed to the issuing magistrate information within the officer's knowledge that negated probable cause." Ibid. (citations omitted and internal quotation marks omitted).  Despite the presumption of probable cause that attaches to an arrest made pursuant to a warrant, "[a] plaintiff can demonstrate that this right was violated where the officer . . . knowingly and intentionally, or with reckless disregard for the truth, made a false statement . . . or omitted material information, and where such false or omitted information was necessary to the finding of probable cause." Ibid. (citations omitted and internal quotation marks omitted).

The Plaintiff's assert that a genuine issue of fact exists as to whether Detective McMahon had probable cause to arrest Mr. Harrison for issuing a bad check under Conn. Gen. Stat. § 53a-128.[1]

### 1.     In Submitting The Warrant Application, Defendant McMahon Made A Material False Statement With Reckless Disregard For The Truth

Detective McMahon failed to include evidence of restitution, the Western Union Money Orders, when he submitted the arrest warrant application.  Thus, the warrant application that he submitted to the prosecuting authorities contained a false statement

---

[1] Conn.Gen.Stat. § 53a-128 provides (a) A person is guilty of issuing a bad check when: (1) As a drawer or representative drawer, he issues a check knowing that he or his principal, as the case may be, does not then have sufficient funds with the drawee to cover it, and (A) he intens or believes at the time of issuance that payment will be refused by the drawee upon presentation, and (B) payment is refused by the drawee upon presentation; or (2) he passes a check knowing that the drawer thereof does not then have sufficient funds with the drawee to cover it, and (A) he intends or believes at the time the check is passed that payment will be refused by the drawee upon

("no restitution was made"), that was made with reckless disregard for the truth of the statement.  Moreover, the statement, that no restitution was made, was necessary to the finding of probable cause, and Detective McMahon knew that to be the case.

In the context of a false statement contained in a warrant, "little precedent exists to define 'reckless disregard' for the truth.  United States v. Perez, 247 F.Supp.2d 459, 473 (S.D.N.Y. 2003).  In Franks v. Delaware, 438 U.S. 154, 165, 98 S.Ct. 2674, 57 L.Ed. 2d 667 (1978), the Court referred to information that is not "appropriately accepted by the affiant as true," but "unfortunately" it gives "no guidance" beyond observing that "'negligence or innocent mistake [is] insufficient.'" United States v. Davis, 617 F.2d 677, 694 (D.C.Cir.1979) (quoting Franks, 617U.S. at 171, 98 S.Ct. 2674). *However, where the false statement was critical to the finding of probable cause recklessness may be inferred(emphasis added).*  Golino v. City of New Haven, 950 F.2d 864, 871 (2d Cir. 1991) (citations omitted).

In this case, Detective McMahon testified that he knew it was critical to finding probable cause whether Harrison had made restitution to Mr. Mihalik.  McMahon Dep. at 86.  In his deposition, Detective McMahon even admitted that Harrison made restitution with Money Orders which were still in the possession of Mr. Mihalik.   Id. at 46.   Yet, inexplicably, he failed to take the Money Orders into evidence and investigate the validity of the money orders.  At that time Detective McMahon knew this was a commercial civil

---

presentation, and (B) payment is refused by the drawee upon presentation.

dispute and the affiant, Mihalik, had an obvious personal grievance against Harrison. Moreover, in his deposition, McMahon admitted that his investigation was incomplete and he chose to merely accept Mihalick's assertion that the money orders were invalid.[2] McMahon Dep. at 45.

Indeed, it was not until after the arrest of Mr. Harrison, while he was still being processed, that Detective McMahon commenced any semblance of an investigation, by calling the vendor of the Money Orders to ascertain whether or not they were valid without the signature of the purchaser.  Id. at 85. In fact, in June, 1999, the State's Attorney's Office admitted that the Money Orders were valid when they were given to the Mihalick's on February 14, 1999, at least a week before Detective McMahon submitted his warrant application.   See Exhibit M.   Thus, the State dropped its case against Harrison, and ultimately,  at the State's direction in June, 1999, the Mihaliks finally deposited the Money Orders in the same bank they contended wouldn't accept the Money Orders, and that same bank, not surprisingly, credited the Mihalick's account for the full value of the money orders in the amount of $2,640.00. Julie Mihalick Dep. at 54 & 64.   Indeed, since the statement "no restitution has been made" in the arrest warrant application was critical to the finding of probable cause, recklessness may be inferred. Golino at 871.

---

[2] In Baskin v. Parker, 602 F.2d 1205, 1207 (5th Cir.1979), the court held that there was no probable cause for an officer to obtain a search warrant when he knew or should have known the information that had been supplied to him by the informants was based on a personal grievance, as he had a duty to check to allegations for distortion, misconception or outright untruth..  In this case, Detective McMahon knew the complaint made by Mr. Mihalick was based on a personal grievance in that Mr. Mihalick was claiming Mr. Harrison had bounced a check.  As such,

Under federal law, probable cause to arrest exists "when the authorities have knowledge or reasonable trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991) (citations omitted). Under Connecticut state law, probable cause "comprises such facts as would reasonably persuade an impartial and reasonable mind not merely to suspect or conjecture, but to believe that criminal activity has occurred." State v. Barton, 219 Conn. 529, 548, 594 A.2d 917, 928 (1991) (quoting Stone v. Stevens, 12 Conn. 219, 230 (1837)). An affidavit in support of an arrest warrant must establish that probable cause exists as to each element of the offense. State v. Heinz, 193 Conn. 612, 617, 480 A.2d 452, 456 (1984) (citing U.S. CONST. amends. IV and XIV; CONN. CONST. art I § 7; Illinois v. Gates, 462 U.S. 213, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983); Whiteley v. Warden, 401 U.S. 560, 565 n. 8, 91 S.Ct. 1031, 1035 n. 8, 28 L.Ed.2d 306 (1971); State v. Bember, 183 Conn. 394, 409-10, 439 A.2d 387 (1981); State v. Jackson, 162 Conn. 440, 443, 294 A.2d 517, cert. denied, 409 U.S. 870, 93 S.Ct. 198, 34 L.Ed.2d 121 (1972)).

There are three essential elements to the crime of issuing a bad check: (1) the drawing of a check on a bank or other depositary for payment of money; (2) knowledge at the time of drawing the check that the drawer has no sufficient funds in, or credit with, the bank or depositary to meet the check in full upon presentation; and (2) intent to defraud.

---

Detective McMahon had a duty to investigate Mr. Mihalick's allegations that the Money Orders were invalid.

State v. Callahan, 1 Conn.Cir.Ct. 247, 250, 23 Conn.Supp. 374, 377, 183 A.2d 861, 863 (1962); State v. Sills, 2 Conn.Cir.Ct. 349, 352, 199 A.2d 186, 187 (1963).[3]

Whether or not restitution had been made for the Returned Check was critical to the finding that Mr. Harrison intended to defraud Mr. Mihalick.   This is evidenced by the standardized arrest warrant application's inclusion of the statement that "no restitution has been made."   Exhibit E.   The facts and circumstances surrounding the business transaction between Mr. Mihalik and Mr. Harrison does not lead one, of an impartial and reasonable mind, to believe that criminal activity occurred in this case.   In fact, based on Detective McMahon's previous encounter with Harrison's business, one month earlier, and his prejudicial mindset pertaining to Harrison's business, it's clear he could not have made an impartial assessment of the facts of this case.   Accordingly, under the Connecticut standard, there can be no finding of probable cause of intent to defraud based on the fact that Harrison made restitution with the Money Orders.   As such, the statement that "no restitution has been made" was necessary to the finding of probable cause.


2.     **Detective McMahon Omitted Material Information That Was Necessary To The Finding Of Probable Cause**

Defendant McMahon omitted material information from the arrest warrant

---

[3] Both of the cited cases were addressing the elements of issuing a bad check under Conn.Gen.Stat. § 53-361, which has subsequently been repealed and replaced by Conn.Gen.Stat. § 53a-128, the statute at issue in this case. The substantive elements are the same under either version of the statute.

application in that he failed to attach the disputed Money Orders.  In analyzing the effect of an omission, the court must determine whether the omitted information was material to a finding of probable cause.  Cartier v. Lussier, 955 F.2d 841, 845 (2d Cir.1992).  This process involves correcting the warrant by inserting the information withheld, and then determining whether probable cause still exists.  Ibid.

The crux of Mr. Mihalick's complaint and the issuance of the warrant for Mr. Harrison's arrest was whether or not the Money Orders were valid and redeemable without Mr. Harrison's signature.  Even Detective McMahon recognized that this was "a significant issue."  McMahon Dep. at 86.  Despite this fact, Detective McMahon failed to attach the Money Orders to the arrest warrant application.  McMahon Dep. at 37-40.[4]  The omission of the Money Orders with the arrest warrant application is further supported by reviewing McMahon's incident report.  See Exhibit G.  The only negotiable instrument taken into evidence is the returned check, he didn't include the Money Orders with the warrant application, nor is there any mention that McMahon even inspected the money orders in his narrative.    Moreover, McMahon's omission of the same and his incorrect characterization that Harrison failed to endorse the Money Orders, coupled with no investigation constituted a reckless omission of material information relative to a

---

[4] At his deposition, Detective McMahon indicated that he did not attach the money orders ("I don't believe anything else is submitted"), then he stated he "assume[d]" he did, then he stated "I honestly don't know."  In his January 30, 2003 Affidavit, Detective McMahon now asserts he did send the Money Orders.  Plaintiffs move that the Court disregard Detective McMahon's subsequent affidavit testimony.  Mack v. United States, 814 F.2d 120, 124 (2d Cir. 1987) ("It is well settled in this circuit that a party's affidavit which contradicts his own prior deposition testimony

determination whether restitution was made, when in fact, restitution was made.

As discussed above, whether or not restitution had been made was crucial to the issue of intend to defraud, and therefore whether or not probable cause existed that Mr. Harrison had committed the charge of issuing a bad check.     By his own admissions, Detective McMahon was unfamiliar with money orders in general and whether they needed to be signed.  McMahon Dep. at 47; L. Harrison Dep. at 39.  Despite this fact, prior to submitting the warrant application he did no independent investigation or research regarding the Money Orders or restitution.  McMahon Dep. 41-46.

Had Detective McMahon simply submitted the actual Money Orders with the warrant application, the state's attorney and/or the issuing judge, would have had an opportunity to determine their negotiability  based on their legal training and experience with respect to negotiable instruments and commercial paper.  They would have seen that the money orders were signed by the payor bank, Western Union, and most importantly, were not endorsed by the payee, Mihalik, which on its face makes the Money Orders non-negotiable, but not to any fault of Harrison .   At the very least, the state's attorney and/or the issuing judge would had a question as to the validity of the Money Orders and whether restitution had been made, they would not have signed off on the warrant, and most likely requested  further  investigation  from  the  submitting officer.   In this regard, a jury may conclude that it was significant that the State's Attorney's Office did in fact, determine that

---

should be disregarded on a motion for summary judgment.").

the Money Orders were valid, but not until after Harrison's arrest.  Exhibit M.

    **3.**    **Defendant McMahon Failed To Consider Intervening Exculpatory Evidence Presented to Him Prior to Effecting His Arrest on Harrison**

Regardless of whether probable cause existed when the warrant for Mr. Harrison's arrest was issued, a proposition that the plaintiffs vehemently dispute, probable cause was subsequently negated by intervening exculpatory evidence.  Generally, once a police officer has probable cause to arrest, there is no duty to continue investigating.  Krause v. Bennett, 887 F.2d 362,  371(2d Cir. 1989).  However, when minimal further investigation may exonerate a suspect, such investigation is required.  Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999).  "An officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence suggests that probable cause exists."  Ibid. Indeed, "a police officer's awareness of facts supporting a defense can eliminate probable cause."  Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir.2003); see also Richards v. City of New York, 2003 WL 21036365, *19 (S.D.N.Y. 2003) (In denying defendant's motion for summary judgment based on claim of probable cause in a malicious prosecution action, the court stated "[i]n this case . . . plaintiffs have not merely suggested that the police could have found more evidence to support their case . . . Rather, plaintiffs have offered proof that defendants had evidence in their possession . . . that negated probable cause.").

In reviewing whether probable cause existed at the time of an arrest, the court is required to evaluate the "totality of the circumstances."  McBride v. City of New Haven, 2000 WL 559087, *7 (D.Conn. 2000) (citing Illinois v. Gates, 462 U.S. 213, 238 (1983)). As part of this evaluation, the court "must consider those facts available to the officer at the time of the arrest and immediately before it."  McBride, 2000 WL 559087 at *7 (quoting Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir.1996)); see also Peterson v. County of Nassau, 995 F.Supp 305, 313 (E.D.N.Y. 1998) (city Anderson v. Creighton, 483 U.S. 635, 641, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

After learning of the arrest warrant for her husband, Detective Harrison contacted Western Union to ascertain whether the Money Orders were valid without a signature.  L. Harrison Dep. at 43.  Western Union provided Detective Harrison with a letter verifying that the Money Orders were valid without a signature.  Id. at 45-46; Exhibit K.

On March 30, 1999, Mr. Harrison and Detective Harrison went to the Berlin Police Department with the intent of showing Detective McMahon the letter from Western Union confirming the Money Orders were valid.  K. Harrison Dep. at 42. Detective Harrison informed Detective McMahon that she had a letter from Western Union confirming that the Money Orders were valid.  L. Harrison Dep. at 52.  Instead of listening to the Harrison's, Detective McMahon asked whether the Harrisons had provided the Mihalicks with new money orders.  Ibid.  Detective Harrison informed him they did not because the Money Orders in the Mihalik's possession were valid and could not be cancelled.  Ibid.  Detective

Harrison held out the letter from Western Union for Detective McMahon to inspect.  Ibid. At that point, Detective McMahon became loud and belligerent, stating "I'll tell you what we're going to do, detective. Your husband's under arrest."  Id. at 53; K. Harrison Dep. at 45-46.  Detective McMahon then held a door open leading into the interior of the police department and stated "your husband's going in the back," pointed a finger at Mr. Harrison, and motioned for him to go in the back.  L. Harrison Dep. at 53.  Detective McMahon stated "he's under arrest," and "call in another officer to process him, because I'm going home."  Ibid.  Detective Harrison again informed Detective McMahon that she had a letter stating the Money Orders were valid and again attempted to hand it to him.  Id. at 53-54.  Detective McMahon said "I'm not looking at nothing," and accompanied Mr. Harrison into the interior of the police department.  Id. at 54.

The Harrison's offered proof that the Money Orders were valid, and tried to give Detective McMahon that exculpatory evidence prior to his effecting an arrest of Harrison. However, McMahon refused to consider it, or look at it, prior to effecting Mr. Harrison's arrest.  Clearly, McMahon disregarded plainly exculpatory evidence by refusing to look at the letter from Western Union stating that the Money Orders were valid.  The letter from Western Union represented impartial evidence that the Money Orders were valid and that Mr. Harrison had made restitution, in direct contrast to the statement contained in the warrant application that "no restitution has been made."  Based on the totality of the circumstances and the exculpatory evidence presented, Detective McMahon did not a

have probable cause to believe that Mr. Harrison had not made restitution for the Bounced Check or that he intended to defraud Mr. Mihalick.

    **4.**    **The Charges Against Mr. Harrision Were Dismissed And Therefore He Can Demonstrate A Favorable Outcome Sufficient To Support A False Arrest Claim**

Mr. Harrison obtained a dismissal of the issuing a bad check charge sufficient to support a § 1983 claim for false arrest.  In order to maintain a § 1983 action for false arrest, a plaintiff must prove a favorable outcome in the underlying criminal prosecution. Singleton v. City of New York, 632 F.2d 185, 193-194 (2d Cir. 1980).  Defendant asserts that Mr. Harrison obtained a nolle rather than pursuing the criminal case to an acquittal or an unqualified dismissal, and therefore he cannot maintain his § 1983 claim.[5]  However, Defendant's contention is belied by a review of the proceedings in State v. Harrison. Transcript of State v. Harrison, CR 990182036-S, July 8, 1999 attached as Exhibit .

The transcript of the proceedings in State v. Harrison on July 8, 1999 establish that the Assistant State's Attorney, Carl Taylor, requested that the court enter a nolle of Mr. Harrison's charge.   Id. at 1. In response, Mr. Harrison's attorney, Robert O. Wynne, provided a summary of the facts and specifically requested that the court enter a dismissal.  Id. at 2.  Thereupon, Judge Frank A. Iannotti entered a dismissal.  Moreover, the Conn.Gen.Stat. § 54-56b, the statute authorizing the entrance of a nolle in criminal

---

[5] Plaintiffs object to Defendants' reliance on the State's Attorney's notes deemed by Defendants as a "Record of Court Action of 7/8/99," as this document has not been sworn or attested to as required by Fed.R.Civ.P. 56(e).

cases, provides as follows:

> A nolle prosequi may not be entered as to any count in a complaint or information if the accused …demands either a trial or dismissal, except with respect to prosecutions in which a nolle prosequi is entered upon a representation to the court by the prosecuting official that a material witness has died, disappeared or become disabled or that material evidence has disappeared or has been destroyed and that a further investigation is therefore necessary.

Thus, given that Mr. Harrison demanded a dismissal, and absent a representation regarding one of the exceptions provided for in the statute, a nolle could not have been entered pursuant to the statute.

Even if the Court chooses to analyze the disposition of Mr. Harrison's case as a nolle, the Court should decline to grant Defendant's motion for summary judgment on the basis that Mr. Harrison cannot prove that he obtained a favorable termination of the charges. In Haynes v. City of New London, 2002 WL 1204956 (D.Conn. 2002), the court addressed the precise issue of whether a plaintiff can maintain a false arrest claim despite an entry of a nolle. In denying the defendant's motion for summary judgment, the court stated "[i]t is not necessary that the accused should have been acquitted but it is sufficient that he was discharged without a trial under circumstances amounting to an abandonment of the prosecution without the request or arrangement with him." Id. at *2 (quoting See v. Gosselin, 133 Conn. 158, 160, 48 A.2d 560 (1946). A number of other cases in the

---

Plaintiffs hereby move the Court to disregard the document, and not to consider it as a basis in ruling on the motion for summary judgment.

District of Connecticut have also held that an entry of nolle does not defeat a false arrest claim.  *See, e.g.* Sabir v. Jowett, 214 F.Supp. 226 (D.Conn. 2002); Horton v. Town of Brookfield, 2001 WL 263299 (D.Conn 2001).

Genuine issues of fact exist regarding whether probable cause existed for the arrest of Mr. Harrison and whether the charges against him were terminated in his favor, and therefore the Court should deny Defendants motion for summary judgment.

**C.    DETECTIVE MCMAHON'S ACTIONS WERE OBJECTIVELY UNREASONABLE AND THUS HE IS NOT ENTITLED TO QUALIFIED IMMUNITY**

Detective McMahon's actions in arresting Mr. Harrison without probable cause to believe that he intended to defraud were objectively unreasonable, and therefore he is not entitled to qualified immunity.  Qualified immunity is an affirmative defense that a defendant has the burden of proving.  In re State Police Litigation, 88 F.3d 111, 123 (2d Cir. 1996).  "In a § 1983 action, qualified or 'good faith' immunity shields a police officer . . . from liability . . . if (a) the officer's actions did not violate clearly established law, or (b) it was objectively reasonable for the officer to believe that his actions did not violate such law." Reese v. Garcia, 115 F.Supp.2d 284, 295 (D.Conn.2000) (citations omitted).

The right not to be arrested without probable cause is a clearly established right. Cook v. Sheldon, 41 F.3d 73, 78 (2d Cir.1994).  It does not appear that Detective McMahon is contending otherwise, and therefore the issue is whether it was objectively

reasonable for him to believe that his actions did not violate Mr. Harrison's rights.

"In order to be entitled to summary judgment on [a qualified immunity defense], the officer must adduce sufficient facts that no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff, could conclude that it was objectively unreasonable for the officer to believe that probable cause did not exist." Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986). "In other words, if any reasonable trier of fact could find that the defendants' actions were objectively unreasonable, then the defendants are not entitled to summary judgment." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir.1995).

In this case, viewing the evidence in the light most favorable to, and drawing all inferences most favorable to, Mr. Harrision a reasonable jury could find that Detective McMahon unreasonably believed that probable cause existed on the day Mr. Harrison was arrested. Specifically, a jury could find it was unreasonable for Detective McMahon to believe probable cause existed in that: he had no knowledge as to whether the Money Orders needed to be signed; he failed to do any independent investigation regarding the Money Orders; he concluded that restitution had not been made solely on the claims of Mr. Mihalick; he was aware that  Mr. Mihalick had received the Money Orders, but he treated it like every other bad check case; he failed to consider the letter from Western Union stating the Money Orders were valid without the purchaser's signature; he acknowledged that whether the Money Orders needed to be signed by Harrsion was

"significant issue," but he waited until after Mr. Harrison was arrested to call the vendor of the Money Orders to ascertain whether they needed to be signed, and his ability to impartially assess the circumstances could have been affected by his prior dealings with Harrison.

As a reasonable jury could find that Detective McMahon unreasonably believed that probable cause existed for Mr. Harrison's arrest, Defendants' motion for summary judgment should be denied.

**D.    A REASONABLE JURY COULD FIND THAT THE DEFENDANTS' CONDUCT WAS EXTREME AND OUTRAGEOUS**

A genuine issue of fact exists as to whether Defendants' conduct was sufficiently extreme and outrageous.  A claim for intentional infliction of emotional distress requires proof of the following elements:  (1) that the defendant intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his or her conduct; (2) that the conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe.  In this case, Defendants contend that the undisputed facts establish that no reasonable jury could find that their conduct was extreme and outrageous.[6]  However, there are a number of disputed facts that, if viewed in

---

[6] Defendants' motion for summary judgment and memorandum of law in support thereof only raises addresses the

28

the light most favorable to Plaintiffs, indicate that a reasonable jury could find that the Defendants' conduct was extreme and outrageous.

"Summary judgment is inappropriate for issues involving motive, intent and subjective feelings." United Oil Co. v. Urban Redevelopment Commission, 158 Conn. 364, 376, 260 A.2d 596, 603 (1969). Furthermore, a number of Connecticut courts have held that whether or not conduct was extreme and outrageous is a genuine issue of material fact for the jury. See, e.g. Gilman v. Gilman, 46 Conn.Supp. 21, 23, 736 A.2d 199, 200 (1999); Brown v. Ellis, 40 Conn.Supp. 165, 167-168, 484 A.2d 944, 946 (1984).

In regards to Detective McMahon's conduct, Defendant offers very little analysis of why a reasonable jury could not find it to be extreme and outrageous. Indeed, the only reasoning for his assertion is that "defendants were simply fulfilling their duty to enforce the laws of the State of Connecticut." Defendants' Memorandum of Law, p. 23. However, as previously discussed at length, Detective McMahon falsely arrest Mr. Harrison without probable cause, with no independent investigation of the restitution issue, and without considering impartial exculpatory evidence. Moreover, a jury may find that McMahon had a preconceived opinion of Harrison's guilt based on his encounter with him a month or so earlier. In addition to the actions of Detective McMahon already mentioned, a jury will be presented with the following facts: that Detective McMahon told Mr. Harrison he would

---

second element (i.e. that their conduct was extreme and outrageous). Therefore, Plaintiffs have only addressed the second element in their memorandum of law.

vacate the warrant if restitution was made (McMahon Dep. at 70); that he failed to consult his field manual regarding the definition of an "endorser" (Id. at 88); and that he felt it was "not [his] obligation to research restitution" (Id. at 46).  Given the seriousness that attaches when a person is charge with a felony and the accompanying humiliation of appearing in court accused of a crime, a jury is likely could find that Detective McMahon's conduct was extreme and outrageous.

In regards to Detective Harrison's claim against Defendant Charamut, Defendant asserts that Detective Harrison sought to improperly assert her authority as a police detective, and therefore he was justified in sending the letter dated April 6, 1999 to her police chief.[7]  Exhibit O.  Detective Harrison ardently disputes that she attempted to use her authority as a fellow officer, and in fact such accusations by Defendant Charamut form part of the basis for her claim.

Detective Harrison's claim is based on the Defendant's publication of a number of false and malicious statements to her police chief, including the following: that she "repeatedly stated that she knew of the prosecutors at GA 15 and that she was contemplating contacting said prosecutor and having the arrest warrant vacated;" that Detective Harrison indicated she would use her authority a member of the Naugatuck Police Department to interfere with Detective McMahon's investigation and that she would

_____

[7] Defendant Charamut attached a report from Defendant McMahon dated April 6, 1999 to his letter to Detective Harrison's police chief.  As such, Detective Harrison's claim that Defendant Charamut published false statements

use her authority to have the warrant vacated; that Detective Harrison "made several derogatory comments about Mr. Mihalick;" that Detective Harrison was "extremely belligerent and hostile" toward Detective McMahon; that this act would "come back to [Detective McMahon];" that "knowing that [Detective McMahon's] shift was concluding, [Detective Harrison] yelled at him to, 'Go on. Get out;'" that Detective Harrison stated to Detective McMahon that "she would speak to [him] and behave in any manner that she pleased;" and that Detective Harrison "kept shoving her hand outward and pointing at [Detective McMahon] while coming within several inches of [his] face." Ibid. Detective Harrison categorically denies all of these accusations. L. Harrison Dep. at 36-39; Affidavit of Laura Harrison of 4/12/04, attached as Exhibit P.

A reasonable jury could find the involvement of Detective Harrison's superiors and inclusion of the letter from Detective McMahon containing the above false accusations against Detective Harrison and Mr. Harrison were intended for no other reason than to embarrass, humiliate and cause Detective Harrison anguish at her place of employment involving a commercial matter of her husband. Especially when Detective Harrison could be viewed as concerned spouse with knowledge as to the seriousness of the bogus charges being filed against her husband. Further, it is not unreasonable that a jury could find the actions and involvement of Chief Charamut were outrageous.

---

includes the statements contained in Defendant McMahon's report.

## IV.     <u>CONCLUSION</u>

Based on the above and the attached exhibits, Plaintiffs contend that numerous facts are genuinely at issue and object to Defendants' motion for summary judgment and respectfully request that the Court deny said motion.

PLAINTIFFS,

_____
Robert O. Wynne
Gould, Killian & Wynne
280 Trumbull Street, 21st Floor
Hartford, CT 06103
TEL: (860) 278-1270
FAX: (860) 244-9290
Federal Bar No. CT 10394

## **CERTIFICATION**

I hereby certify that on the 12th day of April 2004 a copy of the foregoing was sent via first-class mail, postage-prepaid to:

James N. Tallberg, Esq.
Updike Kelly & Spellacy, P.C.
One State Street
P.O. Box 23127
Hartford, CT  06123-1277

Paul W. Smith, Esq.
36 Main Street
P.O. Box 338
Windsor Locks, CT  06096

_____
Robert O. Wynne